## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| GD GROUP USA COMPANY, an Illinois corporation, | ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 1:23-cv-00176 |
| GEORGE AYD; HAMILTON RESOURCES DIRECT, a business organization of unknown place of organization; MEDMARC CASUALTY INSURANCE COMPANY, a Vermont corporation; PROASSURANCE SPECIALTY INSURANCE COMPANY, a Vermont corporation, sometimes doing business as Noetic Specialty Insurance; PROASSURANCE CORPORATION, a Delaware corporation; NOETIC SPECIALTY INSURANCE COMPANY, a business organization of unknown place of organization; and HAMILTON RESOURCES CORPORATION, a Delaware corporation, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Hon. Judge Jorge L. Alonso Magistrate Judge Jeffrey Cole JURY DEMANDED |
| Defendants. | ) ) | |
| _____ | ) | |
| MEDMARC CASUALTY INSURANCE COMPANY, a Vermont corporation, | ) ) ) | |
| Counter-Plaintiff, | ) ) | |
| v. | ) ) ) | |
| GD GROUP USA COMPANY, an Illinois corporation, | ) ) | |
| Counter-Defendant. | ) ) | |

## AMENDMENT TO COMPLAINT

The Plaintiff, GD GROUP USA COMPANY, an Illinois corporation ("GD" or "Plaintiff"), by its attorney, Gregg Minkow of Minkow & Bergman, LLC, supplements its original Complaint herein [Dkt. 1-1, the "Complaint"] with the following, pled in the alternative of the other Counts of this Complaint:

1

## COUNT IV – BREACH OF INSURANCE CONTRACT

35.     GD incorporates herein by this reference ¶¶ 1-14 of this Complaint.

36.     On or about November 30, 2021, one or more of the Defendants (purportedly Medmarc Casualty Insurance Company ["Medmarc"], based on the face of the document) entered into an insurance contract represented by a renewal policy, whose terms on information and belief were those set forth in **Exh. 3** attached to the Complaint as originally filed herein (the "Policy").

37.      The Policy provided, among other things, for defense and indemnity against damages to the property of GD's customers or third parties claimed during the Policy's coverage period (December 15, 2021 thru December 15, 2022) to have been caused by goods sold to them by GD.

38.     On March 18, 2022, during the Policy's coverage period, GD filed a lawsuit in Harris County, Texas, 151st Judicial District, as Cause No. 2022-16805, against one of its customers, Alcon Research, LLC ("Alcon"), and another customer working in cooperation with Alcon, for allegedly breaching and anticipatorily breaching contracts for GD to supply them medical gowns.

39.     Alcon and the other customer included the gowns they bought from GD within "Custom Paks" along with other components (property never made, sold or owned by GD), and then sold the Custom Paks to healthcare providers. Those other Custom Pak items are sometimes referred to as "non-gown items."

40.     On April 11, 2022, Alcon filed a Counterclaim against GD, alleging, among other things, that Alcon and its customers sustained a variety of damages in connection with moldy gowns supplied by GD being placed into Custom Paks with non-gown items and sold

downstream to healthcare professionals. The Counterclaim was amended on September 27, 2022; that operative Amended Counterclaim is attached hereto as **Exh. 4** (excluding its internal exhibits).[1]

41.     Both the original Alcon Counterclaim and its Amended Counterclaim alleged that entire Custom Paks and their contents were rendered useless as a result of the allegedly moldy gowns they included. The Amended Counterclaim stated, in part, "Alcon sustained damages including, but not limited to, the purchase price of GD's gowns, the cost to inspect GD's gowns, *the cost of the Custom Paks that had to be destroyed … .*" (Emphasis added.)

42.     GD tendered both the original Counterclaim and the Amended Counterclaim to Medmarc's claims processing personnel for defense and indemnity promptly after learning of them and of the claims they contained.

43.     Medmarc responded with coverage denial letters as to both the original Counterclaim and the Amended Counterclaim, the latter being dated November 9, 2022 and acknowledging that "Alcon seeks direct and consequential damages relating to GD's surgical gowns: (1) the gowns' purchase price; (2) costs to inspect the gowns; (3) costs of the destroyed Custom Paks, including costs to replace the non-gown components; (4) FDA recall costs; (5) Field Correction costs; (6) the gowns' replacement costs; (7) loss of production costs; and (8) reputational harm."

44.     The denial letters are based primarily on Medmarc's contention that the Amended Counterclaim alleges damage only to GD's own products or work, but in fact the Amended Counterclaim alleges that entire Custom Paks – which are not products or work of GD – were

---

[1] GD attaches and discusses Alcon's Amended Counterclaim without adopting its allegations as true. GD is in fact vigorously contesting virtually all material allegations of Alcon's Amended Counterclaim, even

rendered useless and had to be destroyed. Among other things, the Amended Counterclaim appears to be alleging that mold from GD gowns either adversely affected the non-gown items in already-assembled Custom Paks, or that there was a sufficiently perceived risk thereof which required that whole Custom Paks be discarded.

45.     The denial letters also assert that certain coverage is reduced from $2 Million to a previous limit of $1 Million because of when the alleged defects may have occurred, but whether the losses all occurred before the policy limit was raised is at most uncertain at this time, and Medmarc's position is also contrary to the claims-made policy and renewal/retroactive provisions of the Policy.

46.     While some categories of damages claimed by Alcon might not be covered for defense and indemnity (if proven) under the Policy, others clearly are.

47.     GD has performed all conditions on its part entitling it to defense and indemnity under the Policy, and even if one only looks at those damages claims which clearly would be covered by the Policy if Alcon proves them, the amounts alleged by Alcon for just those damages exceed the $2 Million coverage amount appearing in the Policy.

48.     Medmarc's denial of coverage and refusal to provide a defense currently to the original Counterclaim and the Amended Counterclaim in the Texas lawsuit, and indemnity in the event of an adverse judgment against GD under the allegations of Alcon's Amended Counterclaim, comprise breaches of the Policy terms, including but not limited to its coverages for physical injury to property of others that was not supplied by GD, and for loss of use of tangible property of others not supplied by GD that has been physically injured or which incorporates GD's product or work and is thought to be defective or dangerous and not

---

while seeking defense and indemnity from Medmarc due to the certainty of defense costs being incurred and the possibility of an adverse judgment.

4

remediable just by removing GD's product or work.

49.     GD has suffered damages in excess of $2 Million as a result of the Medmarc's breach of the Policy terms, including but not limited to out-of-pocket defense fees in excess of $100,000.00 incurred to date and exposure in the event of an adverse judgment in Texas.

WHEREFORE, GD requests a finding that Medmarc owes it defense and indemnity against Alcon's Amended Counterclaim, and owed it a defense against Alcon's original Counterclaim; judgment against Medmarc and any other Defendants in this cause who were issuers of the Policy, jointly and severally, for all damages suffered by GD to date and in the future as a result of their breach; costs of suit; and such other relief as may be available to GD at law or in equity.

May 24, 2023

Gregg Minkow
Minkow & Bergman, LLC
161 N. Clark Street, Suite 1600
Chicago, IL 60601
847-489-6999
gminkow@minkowbergman.com
Atty. ID 6181058

GD GROUP USA COMPANY,
Plaintiff/Counter-Defendant

By: _____/s/ Gregg I. Minkow_____
                Its Attorney

# EXHIBIT 4

**CAUSE NO. 2022-16805**

| | | |
|---|---|---|
| **GD GROUP USA COMPANY,** an Illinois corporation, | § § § | IN THE DISTRICT COURT OF |
| Plaintiff, | § § | |
| v. | § § | HARRIS COUNTY, TEXAS |
| **ALCON RESEARCH, LLC,** a Delaware limited liability company; **FLEXTRONICS INTERNATIONAL USA INC.,** a California corporation; and **FLEXTRONICS INTERNATIONAL EUROPE B.V.,** a suspected Netherlands corporation operating in Texas without being qualified to do so, | § § § § § § § § § | 151st JUDICIAL DISTRICT |
| Defendants. | § § | |

## DEFENDANT ALCON RESEARCH, LLC'S FIRST AMENDED COUNTERCLAIMS TO PLAINTIFF GD GROUP USA COMPANY'S AMENDED PETITION

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COMES Alcon Research, LLC ("Alcon" or "Counter-Plaintiff") and, pursuant to Rule 502.6(a) of the Texas Rules of Civil Procedure, hereby brings the instant amended counterclaims against GD Group USA Company ("GD" or "Counter-Defendant").

### I.      DISCOVERY PLAN AND RULE 193.7 NOTICE

1.      Alcon requests that discovery be conducted under Level 3 of Rule 190.3 of the Texas Rules of Civil Procedure.

2.      Notice is hereby given that, pursuant to Rule 193.7 of the Texas Rules of Civil Procedure, Alcon intends to use all documents produced by any other party in this matter at all pre-trial proceedings and at trial in this matter.

## II.     TEXAS RULE OF CIVIL PROCEDURE RULE 47 STATEMENT

3.     Alcon brings causes of action against GD for breaches of contracts and breaches of warranties relating to the sale of goods under Article 2 of the Texas Business & Commerce Code § 2.101, *et seq*. Alcon seeks monetary relief over $1,000,000, and all other relief, general and special, legal and equitable, to which Alcon may be entitled. The damages sought are within the jurisdictional limits of the Court.

## III.     PARTIES TO THE COUNTERCLAIMS

4.     Counter-Plaintiff Alcon is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business in the State of Texas, located at 6201 South Freeway, Fort Worth, Texas 76134.

5.     On information and belief, Counter-Defendant GD Group USA Company is a corporation organized and existing under the laws of the State of Illinois with its principal place of business at 1286 Humbracht Circle, Bartlett, Illinois 60103.

## IV.     JURISDICTION

6.     The counterclaims herein are compulsory counterclaims brought pursuant to Texas Rule of Civil Procedure 97(a). Further, the Court has subject matter jurisdiction over the counterclaims because they are not within the exclusive appellate or original jurisdiction of another court. Tex. Const., Art. 5, § 8. Moreover, the amount in controversy under the counterclaims exceeds this Court's minimum jurisdictional requirements.

7.     This Court has personal jurisdiction over GD, as it has submitted itself to the jurisdiction of this Court by at least filing its Original Petition. Further, pursuant to the contracts between GD and Alcon, the contracts were formed in Texas.

**V.      FACTS**

8.      Alcon is a major provider of surgical equipment used by eye surgeons (ophthalmologists) throughout North America, including sets of surgical equipment that Alcon customizes and prepares for its surgical clients ("Custom Paks").

9.      Each of Alcon's Custom Paks is to include a sterile surgical gown, along with up to dozens of other items, as customized by Alcon's surgical clients.

10.      Alcon does not manufacture surgical gowns for inclusion in Custom Paks but instead purchases said gowns from vendors.

11.      In May 2013, Alcon and GD entered into a valid and enforceable contract titled "Standard Purchase Description" relating to the purchasing relationship between Alcon and GD, including Alcon's purchases of surgical gowns sold by GD (the "Quality Agreement") (attached hereto as **Exhibit A**).

12.      Pursuant to the Quality Agreement, GD agreed to, among other things, the following:

   a)      "In the event a Product Recall becomes necessary, [GD] will cooperate fully with Alcon to ensure that all affected product/units is/are properly quarantined and/or otherwise removed from their distribution channel until final disposition is granted." Quality Agreement at § 8.1.3 ("Quality Agreement Recall Cooperation Clause").

   b)      "[GD] shall have in place and maintain a Quality System that meets the appropriate requirements of U.S. FDA 21 CFR part 820 – Quality System Regulation and or current issue, ISO 9001:2008, and EN ISO 13485:2003." Quality Agreement at § 10.1 ("Quality Agreement ISO Quality System Requirements Clause").

   c)      "[GD] shall maintain and validate the manufacturing processes and supporting plant systems in accordance with current FDA and/or ISO industry standards." Quality Agreement at § 10.2 ("Quality Agreement Manufacturing Process and Systems Clause").

   d)      "[GD] shall maintain and monitor environmental and personnel controls to

3

the extent necessary to ensure that the product conforms to Alcon product specifications." Quality Agreement at § 10.5 ("Quality Agreement Environmental Monitoring Clause").

e)    "[GD] shall ensure that materials of construction are adequately evaluated, inspected, and/or tested to determine suitability prior to use and that they are used within any established expiration dates." Quality Agreement at § 10.10 ("Quality Agreement Materials Inspection Clause").

f)    "[GD] shall ensure that any materials found to be non-conforming and/or not suitable for use are adequately controlled to prevent inadvertent use." Quality Agreement at § 10.11 ("Quality Agreement Non-Conforming Materials Clause").

g)    "Alcon reserves the right to return any lot(s) of material to [GD] if the defect is deemed unacceptable, based on potential patient safety issues, perceived customer dissatisfaction, or Alcon assembly risks; regardless of percent defective found." Quality Agreement at § 13.4 ("Quality Agreement Right of Return for Safety Clause").

13.    As a result of the Covid-19 pandemic that began in 2020, there was a shortage of personal protective equipment ("PPE"). This shortage affected the available supply of surgical gowns, which are necessary for eye surgeries to take place.

14.    Because of the surgical gown shortage, Alcon was forced to order surgical gowns from GD for inclusion in the Custom Paks for Alcon's surgical clients, despite GD's increasing its gown prices to approximately triple the normal price of gowns from other vendors.

15.    Between the fall of 2020 and April 2021, Alcon submitted to GD a series of "Purchase Orders" for surgical gowns ("Purchase Orders") (a representative subset of the Purchase Orders attached hereto as **Exhibit B**).

16.    Each Purchase Order stated:

"THIS PURCHASE ORDER IS EXPRESSLY LIMITED TO, AND EXPRESSLY MADE CONDITIONAL ON, SELLER'S ACCEPTANCE OF THE TERMS OF THE ORDER AND THE PURCHASE ORDER TERMS AND CONDITIONS WHICH MAY BE ACCESSED ELECTRONICALLY AT https://suppliers.alcon.com..."

4

17.     At the link Alcon provided in each Purchase Order, there was a seven-page document which outlined the standard terms and conditions that apply to each Purchase Order regarding Alcon's purchase of these GD's gowns ("Purchase Order Terms and Conditions") (attached hereto as **Exhibit C**).

18.     Pursuant to the Purchase Order Terms and Conditions, GD agreed to, among other things, the following:

a)      "[GD] expressly warrants that all goods and/or services furnished under this Agreement shall conform to all specifications and appropriate standards and will be free from defects in material or workmanship…[GD] warrants that all goods and/or services furnished hereunder will be merchantable, and will be safe and appropriate for the purpose for which goods and/or services of that kind are normally used. If [GD] knows or has reason to know the particular purpose for which [Alcon] intends to use the goods and/or services [GD] warrants that such goods and/or services will be fit for such particular purpose..." Purchase Order Terms and Conditions at 1 ("Purchase Order Warranties Clause").

b)      "As to manufactured goods, [GD] warrants that it shall, as applicable, manufacture and perform all of its obligations hereunder with the current good manufacturing practices as defined by applicable laws, standards, rules, regulations, and requirements, including, without limitation, Good Manufacturing Practices and General Biologics Products Standards as promulgated under the United States Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 et seq, and all applicable national implementing laws, regulations and guidelines, and all applicable standards, including, but not limited to, ISO 9000 and ISO 13485 standards, and EN 724 standards. These warranties shall survive inspection, test, acceptance and use." Purchase Order Terms and Conditions at 1-2 ("Purchase Order Manufacturing Standards Clause").

c)      "Payment for the goods and/or services delivered hereunder shall not constitute acceptance thereof. [Alcon] shall have the right to inspect such goods and/or services and to reject any or all of said goods and/or services which are in [Alcon's] judgment defective or nonconforming. Goods and/or services rejected and goods and/or services supplied in excess of 105% of quantities called for herein may be rejected and returned to [GD] at its expense and in addition to [Alcon's] other rights..." Purchase Order Terms and Conditions at 3 ("Purchase Order Inspection and Rejection Clause").

d)      "[GD] warrants that all goods and/or services supplied hereunder will have

5

been produced in compliance with and [GD] agrees to be bound by all applicable federal, state, and local laws of the United States and each jurisdiction in which it conducts business, along with relevant governmental orders, rules and regulations. [GD] will comply with product-related regulatory obligations that impact product packaging (as supplied by [GD]), chemical substance use, material safety data sheet development, and similar product-related environmental legislation." Purchase Order Terms and Conditions at 3 ("Purchase Order Product Regulatory Obligations Clause").

e)  "[GD] agrees that it shall, as applicable, manufacture and perform all of its obligations hereunder with the current good manufacturing practices as defined by applicable laws, standards, rules, regulations and requirements, including, without limitation, Good Manufacturing Practices and General Biologics Products Standards as promulgated under the United States Federal Food, Drug, and Cosmetic Act, 21 U.S.C. §301 et seq, and all applicable national implementing laws, regulations and guidelines, and all applicable standards, including, but not limited to, ISO 14001, ISO 9000 and ISO 13485 standards, and EN 724 standards." Purchase Order Terms and Conditions at 3 ("Purchase Order Manufacturing and Biologics Standards Clause").

f)  "All claims for money due or to become due from [Alcon] shall be subject to deduction or setoff by [Alcon] by reason of any counterclaim arising out of this or any other transaction with [GD]." Purchase Order Terms and Conditions at 4 ("Purchase Order Setoff Clause").

19.  The gowns Alcon ordered from GD were subject to both the Quality Agreement and the Purchase Order Terms and Conditions, and Alcon proceeded to prepare Custom Paks using those gowns once they were received.

20.  Unfortunately, however, it turned out that numerous GD surgical gowns did not meet the standards in the Quality Agreement or Purchase Order Terms and Conditions, and were not fit for their intended purpose, resulting in significant damage to Alcon.

21.  Beginning in January 2021, Alcon began receiving complaints from Custom Pak customers that the pull tags of the surgical gowns in their Custom Paks had mold on them.

22.  Surgical gown pull tags are not supposed to have mold on them. Surgical gown pull tags are used to zip-up surgical gowns while in the sterile operating environment.

23.    Alcon began investigating these client complaints and was sent samples of the gowns that the surgical customers said contained mold. Alcon tested the gowns and determined there was, in fact, mold residue on the gown pull tags.

24.    This image is an example of a GD surgical gown pull tag with mold residue:



25.    This image is another example of a GD surgical gown pull tag with mold residue:



26.     Alcon discovered that all the reports of gowns with mold issues related to gowns that GD sold to Alcon.

27.     In January 2021, Alcon informed GD of the client complaints Alcon was receiving regarding the mold residue discovered on GD's gowns.

28.     GD acknowledged that there was mold residue on the gowns it sold to Alcon.

29.     GD informed Alcon that the moldy gowns were manufactured by a company in China and the mold issues were likely a result of high humidity in China.

30.     However, GD assured Alcon that the only GD gowns affected by the mold issues were gowns within a discrete number of lots, or batches, of gowns that GD had sold to Alcon.

31.     On or around February 1, 2021, Alcon informed the U.S. Food and Drug Administration ("FDA") of the complaints Alcon was receiving regarding mold residue on GD's gowns, and Alcon began a recall and destruction of the Custom Paks that had been shipped to its customers with GD gowns from the lots that had been identified as having gowns with mold issues.

32.     Alcon's recall of the already-shipped Custom Paks containing GD gowns was an expensive process because Alcon had to: (i) determine which clients had received Custom Paks with potentially affected GD gowns; (ii) contact those clients to inform them of the mold issues; (iii) send replacement Custom Paks – including the non-gown components of those Custom Paks – to those clients; and (iv) destroy the Custom Paks with potentially affected GD gowns, including non-gown components.

33.     In addition, Alcon had to enhance inspection efforts for the GD gowns that had not already been incorporated into Custom Paks for Alcon's clients. To inspect a GD gown for possible mold issues, a person needed to open the packaging of each gown, unfold each gown, and examine each gown. If there was no issue of mold with a particular gown, the person would then need to

refold that gown and put it back into the packaging for later sterilization and inclusion in a Custom Pak. If there was an issue of mold with a particular gown, it could not be used and would be segregated for destruction in order to prevent accidental inclusion in any Custom Paks. These enhanced inspection efforts were also costly for Alcon.

34.     Despite GD's claims that there was a limited number of lots that potentially contained gowns with mold issues, Alcon continued receiving client complaints and learned that the mold issue was more prevalent than GD had claimed.

35.     As such, over the next several weeks, Alcon continued to update the FDA regarding new client complaints relating to GD's gowns and Alcon's efforts in response to the defective gowns, including the expansion of Alcon's recall of Custom Paks to more lots of GD gowns. In addition, Alcon expanded the already-enhanced inspection efforts for GD gowns that had not yet been incorporated into Custom Paks sent to Alcon's clients, inspecting more lots and increasing sample sizes as Alcon received new complaints regarding gowns from additional GD lots. This expanded recall, and destruction of the Custom Paks, including non-gown components. These further-enhanced inspection efforts were again costly for Alcon.

36.     Through the inspection efforts of Alcon and its vendors, many more GD gowns with mold issues were discovered.

37.     In light of both the general PPE and medical equipment shortage caused by the Covid-19 pandemic and the size of Alcon's market share, if the continued recall of the Custom Paks were to have become large enough, it could have potentially affected the ability of ophthalmologists to perform eye surgeries across North America. As such, Alcon was forced to develop a new plan in response to GD's defective gowns.

38.     On or around May 4, 2021, Alcon had an in-person meeting with the FDA, at which Alcon proposed that, if approved by the FDA, rather than recalling and destroying potentially affected Custom Paks and all of their contents, Alcon would send clients, with potentially affected Custom Paks, standalone replacement gowns and instructions to remove the GD gowns in the Custom Paks, dispose of them without unfolding them, and use the standalone replacement gowns instead (the "Field Correction").

39.     The Field Correction approach would enable Alcon to use the supply of already-built but potentially-affected Custom Paks it had on hand – each of which contained much more than just surgical gowns – instead of destroying them entirely as part of the recall.  Likewise, potentially affected Custom Pak clients would be able to use their currently available Custom Paks with a replacement gown instead of having to cancel surgeries.

40.     While waiting for the FDA's approval of Alcon's Field Correction proposal, Alcon continued recalling and destroying the potentially affected Custom Paks and conducting enhanced inspection of GD gowns, so as to keep the flow of Custom Paks going and to prevent surgeries from having to be cancelled.

41.     On or around May 24, 2021, the FDA approved Alcon's Field Correction strategy. But Alcon still needed replacement gowns in order to implement the Field Correction strategy. In addition, several Alcon clients refused to accept Alcon's Field Correction strategy, resulting in Alcon having to send those clients full replacement Custom Paks with new gowns.

42.     As a result of the expensive inspection process, GD's inaccurate statements regarding the extent of the mold issue, and GD's failure to provide sufficient information regarding how GD would resolve the mold issue going forward, Alcon was forced to purchase replacement gowns from other vendors.

43. In light of the ongoing pandemic and related shipping delays, Alcon spent millions of dollars to be able to timely receive replacement gowns from other vendors and provide them to Alcon's surgical clients to prevent surgeries from being cancelled.

44. At the same time, Alcon was forced to manage numerous client complaints and inquiries regarding the mold issues related to GD gowns that were included in Alcon's Custom Paks. These complaints and inquiries required hundreds of hours for Alcon employees to address.

45. The mold issues arising out of GD's gowns caused reputational harm to Alcon in the medical industry.

46. In addition, during Alcon's inspection of GD's gowns, Alcon discovered that numerous gowns contained incorrect label stamping. For example, Alcon discovered GD gowns that were size Large which had been stamped as size Medium, and vice versa. Alcon discovered GD gowns in all four sizes that had been stamped with the incorrect size stamp ("Incorrect Label Stamping").

47. Alcon informed GD of the Incorrect Label Stamping and attempted to return these gowns to GD because they did not meet quality standards. GD refused to accept the gowns with the Incorrect Label Stamping.

## VI.    COUNTERCLAIMS

### COUNTERCLAIM NO. 1 – BREACH OF CONTRACT (QUALITY AGREEMENT)

48. Alcon incorporates Counterclaim paragraphs 1 through 47 by reference as though fully stated herein.

49. The Quality Agreement is a valid and enforceable contract entered into among Alcon and GD.

50. Alcon has fully performed, substantially performed, tendered performance, or was

excused from performing its contractual obligations under the Quality Agreement.

51.     As described in greater detail above, GD breached the Quality Agreement in a number of material ways, including, but not limited to GD's failure to deliver non-defective, conforming, and/or suitable surgical gowns to Alcon because many of the gowns contained mold residue and/or Incorrect Label Stamping.

52.     GD breached several clauses of the Quality Agreement including, but not limited to, the Quality Agreement Recall Cooperation Clause, the Quality Agreement ISO Quality System Requirements Clause, the Quality Agreement Manufacturing Process and Systems Clause, the Quality Agreement Environmental Monitoring Clause, Quality Agreement Materials Inspection Clause, and the Quality Agreement Non-Conforming Materials Clause. *See supra* Para. 12(a) through (g).

53.     As a proximate result of GD's breach of contract, Alcon sustained damages including, but not limited to, the purchase price of GD's gowns, the cost to inspect GD's gowns, the cost of the Custom Paks that had to be destroyed, including the cost to replace third-party property such as non-gown components, the costs of the FDA recall and Field Correction, the cost for replacement gowns, loss of production, reputational harm, and other associated costs.

54.     Alcon has also incurred, and will continue to incur, attorneys' fees as a result of the above-referenced breaches.

**COUNTERCLAIM NO. 2 – BREACH OF CONTRACT (PURCHASE ORDERS)**

55.     Alcon incorporates Counterclaim paragraphs 1 through 54 by reference as though fully stated herein.

56.     The Purchase Orders are valid and enforceable contracts entered into among Alcon and GD.

57.     Alcon has fully performed, substantially performed, tendered performance, or was excused from performing its contractual obligations under the Purchase Orders.

58.     As described in greater detail above, GD breached the Purchase Orders in a number of material ways, including, but not limited to GD's failure to deliver non-defective, conforming, and/or suitable surgical gowns to Alcon because many of the gowns contained mold residue and/or Incorrect Label Stamping.

59.     GD breached several clauses of the Purchase Orders including, but not limited to, the Purchase Order Warranties Clause, Purchase Order Manufacturing Standards Clause, Purchase Order Inspection and Rejection Clause, Purchase Order Product Regulatory Obligations Clause, Purchase Order Manufacturing and the Biologics Standards Clause. *See supra* Para. 18(a) through (f).

60.     As a proximate result of GD's breach of contract, Alcon sustained damages including, but not limited to, the purchase price of GD's gowns, the cost to inspect GD's gowns, the cost of the Custom Paks that had to be destroyed, the costs of the FDA recall and Field Correction, the cost for replacement gowns, loss of production, reputational harm, and other associated costs.

61.     Alcon has also incurred, and will continue to incur, attorneys' fees as a result of the above-referenced breaches.

### COUNTERCLAIM NO. 3 – BREACH OF WARRANTY (QUALITY AGREEMENT)

62.     Alcon incorporates Counterclaim paragraphs 1 through 61 by reference as though fully stated herein.

63.     The Quality Agreement is a valid and enforceable contract entered into among Alcon and GD.

64.     Alcon has fully performed, substantially performed, tendered performance, or was excused from performing its contractual obligations under the Quality Agreement.

65.     As described in greater detail above, GD made several affirmations and promises in the Quality Agreement, including, but not limited to, delivering surgical gowns to Alcon that were non-defective, conforming, and/or suitable.

66.     GD's affirmations and promises were part of the basis for the bargain with Alcon and Alcon relied on such affirmations and promises in making the purchases of GD's gowns.

67.     As described in greater detail above, GD breached the Quality Agreement in a number of material ways, including, but not limited to, delivering surgical gowns to Alcon that were defective, non-conforming, and/or unsuitable because many of the gowns contained mold residue and/or Incorrect Label Stamping.

68.     GD breached several clauses of the Quality Agreement including, but not limited to, the Quality Agreement Recall Cooperation Clause, Quality Agreement ISO Quality System Requirements Clause, Quality Agreement Manufacturing Process and Systems Clause, Quality Agreement Environmental Monitoring Clause, Quality Agreement Materials Inspection Clause, and the Quality Agreement Non-Conforming Materials Clause. *See supra* Para. 12(a) through (g).

69.     GD has received sufficient and timely notice of the breaches of warranty alleged herein.  Despite this notice and GD's knowledge, GD refused to honor its warranty, even though it knew of the defects in the gowns it sold to Alcon.

70.     As a proximate result of GD's breach of the warranty, Alcon sustained financial damages including, but not limited to, the purchase price of GD's gowns, the cost to inspect GD's gowns, the cost of the Custom Paks that had to be destroyed, including the cost to replace third-

party property such as non-gown components, the costs of the FDA recall and Field Correction, the cost for replacement gowns, loss of production, reputational harm, and other associated costs.

71.     Alcon has also incurred, and will continue to incur, attorneys' fees as a result of the above-referenced breaches.

72.     Pursuant to Tex. Bus. & Com. Code Ann. § 2.714, Alcon is entitled to recover a money judgment against GD in an amount to be determined at trial.

**COUNTERCLAIM NO. 4 – BREACH OF WARRANTY (PURCHASE ORDERS)**

73.     Alcon incorporates Counterclaim paragraphs 1 through 72 by reference as though fully stated herein.

74.     The Purchase Orders are valid and enforceable contracts entered into among Alcon and GD.

75.     Alcon has fully performed, substantially performed, tendered performance, or was excused from performing its contractual obligations under the Purchase Orders.

76.     As described in greater detail above, GD made several affirmations and promises in the Purchase Orders, including, but not limited to, delivering surgical gowns to Alcon that were non-defective, conforming, and/or suitable.

77.     GD breached several clauses of the Purchase Orders including, but not limited to, the Purchase Order Warranties Clause, Purchase Order Manufacturing Standards Clause, Purchase Order Inspection and Rejection Clause, Purchase Order Product Regulatory Obligations Clause, Purchase Order Manufacturing and the Biologics Standards Clause. *See supra* Para. 18(a) through (f).

78.     GD's affirmations and promises were part of the basis for the bargain with Alcon and Alcon relied on such affirmations and promises in making the purchases of GD's gowns.

79.     As described in greater detail above, GD breached the Purchase Orders in a number of material ways, including, but not limited to, delivering surgical gowns to Alcon that were defective, non-conforming, and/or unsuitable because many of the gowns contained mold residue and/or Incorrect Label Stamping.

80.     GD has received sufficient and timely notice of the breaches of warranty alleged herein.  Despite this notice and GD's knowledge, GD refused to honor its warranty, even though it knows of the defects in the gowns it sold to Alcon.

81.     As a proximate result of GD's breach of the warranty, Alcon sustained financial damages including, but not limited to, the purchase price of GD's gowns, the cost to inspect GD's gowns, the cost of the Custom Paks that had to be destroyed, including the cost to replace third-party property such as non-gown components, the costs of the FDA recall and Field Correction, the cost for replacement gowns, loss of production, reputational harm, and other associated costs.

82.     Alcon has also incurred, and will continue to incur, attorneys' fees as a result of the above-referenced breaches.

83.     Pursuant to Tex. Bus. & Com. Code Ann. § 2.714, Alcon is entitled to recover a money judgment against GD in an amount to be determined at trial.

**COUNTERCLAIM NO. 5 –**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**

84.     Alcon incorporates Counterclaim paragraphs 1 through 83 by reference as though fully stated herein.

85.     GD's implied warranty of merchantability accompanied the sale of all the surgical gowns that GD sold to Alcon.

86.     GD is a merchant in the sale of surgical gowns. GD manufactures, markets, and sells surgical gowns. GD provided Alcon with an implied warranty that the surgical gowns were

16

merchantable and fit for the ordinary purposes for which such surgical gowns are sold.

87.    The surgical gowns were unmerchantable and not fit for the ordinary purpose of surgical gowns because many of the gowns contained mold residue and Incorrect Label Stamping.

88.    GD knew or had reason to know that the Alcon purchased the surgical gowns to provide them to surgeons, and their medical staff, to be worn while performing surgeries.

89.    Alcon used the surgical gowns for their intended and ordinary purposes.

90.    Alcon has performed each and every duty required under the terms of the warranties, except as may have been excused or prevented by the conduct of GD or by operation of law in light of GD's conduct.

91.    Alcon has provided sufficient and timely notice to GD regarding the mold residue found on GD's gowns and Incorrect Label Stamping. Despite such notice, GD has failed and refused to offer Alcon an effective remedy.

92.    As a proximate result of GD's breach of the implied warranty of merchantability, Alcon sustained damages including, but not limited to, the purchase price of GD's gowns, the cost to inspect GD's gowns, the cost of the Custom Paks that had to be destroyed, including the cost to replace third-party property such as non-gown components, the costs of the FDA recall and Field Correction, the cost for replacement gowns, loss of production, reputational harm, and other associated costs.

93.    Pursuant to Tex. Bus. & Com. Code Ann. § 2.314, Alcon is entitled to recover a money judgment against GD in an amount to be determined at trial.

## COUNTERCLAIM NO. 6 –
## BREACH OF IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE

94.    Alcon incorporates Counterclaim paragraphs 1 through 93 by reference as though fully stated herein.

95.     GD's implied warranty of fitness for a particular purpose accompanied the sale of the surgical gowns to Alcon.

96.     At the time of the sale of the surgical gowns to Alcon, GD knew or had reason to know of the particular purpose for which Alcon required the surgical gowns, which was to provide them to surgeons, and their medical staff, to be worn while performing surgeries.

97.     Alcon relied on GD's skill or judgment to select or furnish suitable surgical gowns.

98.     Alcon has performed each and every duty required under the terms of the warranties, except as may have been excused or prevented by the conduct of GD or by operation of law in light of GD's conduct.

99.     Alcon has provided sufficient and timely notice to GD regarding the mold residue found on GD's gowns and Incorrect Label Stamping. Despite such notice, GD has failed and refused to offer Alcon an effective remedy.

100.    As a proximate result of GD's breach of the implied warranty of fitness for a particular purpose, Alcon sustained damages including, but not limited to, the purchase price of GD's gowns, the cost to inspect GD's gowns, the cost of the Custom Paks that had to be destroyed, including the cost to replace third-party property such as non-gown components, the costs of the FDA recall and Field Correction, the cost for replacement gowns, loss of production, reputational harm, and other associated costs.

101.    Pursuant to Tex. Bus. & Com. Code Ann. § 2.315, Alcon is entitled to recover a money judgment against GD in an amount to be determined at trial.

## VII.     ATTORNEYS' FEES AND COSTS

102.     Pursuant to Texas Civil Practices and Remedies Code Chapter 38, Alcon is entitled to recover its reasonable and necessary attorneys' fees incurred in connection with its counterclaims.

## VIII.     JURY DEMAND

103.     Alcon hereby demands that this matter be submitted for a trial by jury of all issues so triable.

## IX.     PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Alcon respectfully requests that the Court enter judgment as follows:

A.     That Plaintiff takes nothing by way of the First Amended Petition and the Court dismiss the First Amended Petition with prejudice;

B.     That the Court enter judgment that Alcon is the prevailing party in this action;

C.     That the Court award Alcon judgment against GD on Alcon's amended counterclaims for actual damages and pre- and post-judgment interest;

D.     That the Court award Alcon all costs, expenses, and attorneys' fees that it is entitled to receive under the law; and

E.     That the Court award any and all relief to which Alcon may be entitled.

Dated: September 27, 2022

Respectfully submitted,

By: */s/ Stephen B. Edmundson*

Stephen B. Edmundson
Texas State Bar No. 00796507
Greenberg Traurig, LLP
1000 Louisiana Street, Suite 1700
Houston, Texas 77002
(713) 374-3525 (Telephone)
(713) 374-3505 (Facsimile)
Email: edmundsons@gtlaw.com

Gregory E. Ostfeld (Pro hac vice pending)
Michael Cedillos (Pro hac vice pending)
Kyle L. Flynn (Pro hac vice pending)
Greenberg Traurig, LLP
77 West Wacker Drive, Suite 3100
Chicago, Illinois 60601
(312) 456-8400 (Telephone)
(312) 456-8435 (Facsimile)
Email: ostfeldg@gtlaw.com
Email: cedillosm@gtlaw.com
Email: flynnk@gtlaw.com

*Attorneys for Defendant Alcon Research, LLC*

## **CERTIFICATE OF SERVICE**

I hereby certify that on September 27, 2022, a true and correct copy of the foregoing document was electronically filed with the Court and served on all counsel of record in accordance with the Texas Rules of Civil Procedure.


*/s/ Stephen B. Edmundson*